# United States District Court
## for the Northern District of Oklahoma

Case No. 21-cv-103-JDR-MTS

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL UNION No. 584,

*Plaintiff,*

*versus*

BRENT ELECTRIC COMPANY, INC.,

*Defendant.*

## OPINION AND ORDER

In 2021, Plaintiff International Brotherhood of Electrical Workers Local Union No. 584 submitted a grievance against Defendant Brent Electric Company, Inc. for the Company's failure to make pension-plan contributions required by the parties' collective bargaining agreement. Dkt. 2.[1] A written arbitration award was issued against the Company, and the Union sued to enforce it. *Id.* The Company filed a four-count counterclaim for declaratory judgment. Dkt. 17. After one of those counts was dismissed, the Company moved for summary judgment on all remaining claims and counterclaims. The Union responded and also moved for summary judgment. Dkts. 83, 99. The Court invited supplemental briefing on the Union's motion, which the Company provided. Dkt. 106. After reviewing the parties' briefs and supporting evidence, the Court denies the Company's motion and enters judgment in the Union's favor on all claims.

---

[1] All citations use CM/ECF pagination.

No. 21-cv-103

I[2]

The International Brotherhood of Electrical Workers Local Union No. 584 is a labor organization representing electrical workers in Tulsa, Oklahoma, for collective bargaining purposes. In 1996, Brent Electric Company signed a letter of assent recognizing the Union as the exclusive representative of its employees and authorizing the Eastern Oklahoma Chapter of the National Electrical Contractors Association to represent the Company in negotiations with the Union. Dkt. 83 at 9. The Company also agreed that it would be bound by any multi-employer collective bargaining agreements negotiated by NECA and the Union. *Id.*

NECA and the Union entered into a multi-employer collective bargaining agreement that, by its terms, was effective from June 1, 2018, through May 31, 2021. *Id.* at 10. The CBA required the Company to make regular contributions to a pension plan, a profit-sharing plan, and a joint apprenticeship and training committee fund (the "JATC fund"). Dkt. 83-3 at 18, 32-33. In or around 2012, the pension plan was underfunded. Dkt. 83 at 10.[3] NECA and the Union entered into a supplemental agreement identified as "Addendum Four Memorandum of Understanding," which increased employers' contribution rates and diverted contributions from the JATC fund to the pension plan. Dkt. 83 at 10-11 (statements of fact nos. 10, 13-14). Addendum Four provided that, when the pension plan reached "full funding (as certified by the Pension Fund's actuary)," an employer could "elect to terminate its obligation to contribute to the Pension Fund" and instead make contributions to a profit-sharing plan. Dkt. 83-4. According to Addendum Four, employers' contributions to the pension plan were due "no later than fifteen (15) days following the end of each calendar month" for which wages were paid. Dkt. 83-4 at 3.

_____

[2] The facts in this section are undisputed unless otherwise noted.

[3] The Union disputes the relevance and admissibility of this statement of fact, but not its substance.

No. 21-cv-103

The Company concluded that the pension plan achieved "full funding" as of January 1, 2020.[4] Based on its determination, the Company sent a letter advising that it would cease making contributions to the pension plan and redirect its contributions to the JATC fund and profit-sharing plan effective November 30, 2020. Dkt. 83 at 12 (statements of fact nos. 23-24).[5] The Company made its November pension-plan contributions on or before December 15, 2020. *Id.* at 13 (statement of fact no. 26). From that point onward, the Company did not make any voluntary payments to the pension plan.

The Company made contributions to the profit-sharing plan and JATC fund in January, February, and March 2021. *Id.* (statements of fact nos. 29-31).[6] Those contributions were rejected and returned to the Company on the grounds that they were made in violation of the CBA. *Id.* at 14-15 (statements of fact nos. 34-41). The administrator for both the pension plan and the profit-sharing plan, Southwest Service Administrators, Inc., advised the Company that it was delinquent in its contributions to the pension plan and threatened to proceed to collections. *Id.* at 15 (statement of fact no. 42). In response, the Company paid the allegedly delinquent contributions and resumed its contributions to the pension plan under protest, reiterating its position that it had no obligation to continue making those payments. *Id.* (statements of fact nos. 43-44).

On February 5, 2021, the Union submitted a grievance alleging that the Company violated Addendum Four by ceasing its contributions to the pension plan in December 2020. *Id.* (statement of fact no. 45). The Company challenged the timeliness of the grievance and opposed it in substance at an

_____

[4] The Union disputes that the pension plan was fully funded but does not dispute that the Company took the position that the plan had reached full funding.

[5] The Company, rather than NECA, sent the letter. By this time, the Company had revoked its letter of assent and was no longer represented by NECA. Dkt. 83 at 12 (statement of fact no. 21).

[6] These contributions were associated with work performed in December 2020, January 2021, and February 2021.

3

arbitration hearing held before the Labor Management Committee on February 10, 2021. *Id.* at 16-17 (statements of fact 47-49, 53).[7] On February 11, 2021, the LMC issued an arbitration award resolving the grievance in the Union's favor and ruling the Company in violation of Addendum Four. *Id.* at 17 (statements of fact nos. 54-55). The LMC did not provide an explanation for its decision, nor did it provide any opportunity for further review. *Id.* (statement of fact no. 56).

The Union sued to enforce the LMC's arbitration award. Dkt. 2. The Company, in response, filed a counterclaim asking the Court to declare that (1) Addendum Four is an agreement separate from the CBA that is not subject to the CBA's dispute-resolution procedures; (2) the Union's grievance was not timely brought and, therefore, was not arbitrable; (3) the LMC acted in manifest disregard of the law and its award failed to draw its essence from the language of Addendum Four; and (4) the Company was in full compliance with Addendum Four and could direct future payments to the profit-sharing plan and JATC fund. Dkt. 17. The Court dismissed the Company's first counterclaim but permitted the remaining three to proceed. Dkt. 62.

The Company moved for summary judgment in its favor with respect to the Union's claim and the surviving counterclaims. Dkt. 83. After filing and withdrawing its own motion for summary judgment [Dkts. 85, 86, 87], the Union requested in its response brief that judgment be entered in its favor on all remaining claims and counterclaims. Dkt. 99 at 9, 29-31. The Court advised the parties that it would consider the Union's request and invited Brent Electric to file a response. Dkt. 105. *See* Fed. R. Civ. P. 56(f) (permitting district courts to grant summary judgment for a nonmovant after "giving

---

[7] The Company calls this event a "meeting" while the Union refers to it as an "arbitration hearing." The difference does not appear to be material because both parties agree that the purpose of the meeting/hearing was to address arguments pertaining to the Union's grievance, that the Company presented evidence and arguments challenging the grievance, and that the LMC took action on the grievance as a result. *See* Dkt. 103 at 1 (agreeing that "the LMC convened . . . to consider the Grievance").

No. 21-cv-103

notice and a reasonable time to respond"). Brent Electric filed a supplemental brief and supporting documents, which the Court has considered together with the other briefs and supporting documents.

## II

A Court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and resolve all disputed facts and draw all reasonable inferences in that party's favor. *See Dominguez v. Weiser Sec. Servs., Inc.*, 172 F.4th 1138, 1144 (10th Cir. 2026). Because both parties moved for summary judgment, the Court analyzes their requests separately, viewing the facts and drawing all inferences in favor of the Union when considering the Company's request, and vice versa. *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016) (setting forth standard applicable when analyzing cross-motions for summary judgment). The Court may only grant summary judgment to a moving party if, when the evidence is viewed and the inferences are drawn in the opposing party's favor, the Court nevertheless concludes that there is no dispute on any material fact and the moving party is entitled to judgment as a matter of law. *Dominguez*, 172 F.4th at 1144.

Where parties file cross-motions for summary judgment, the Court must consider the motions independently, and the denial of one motion does not necessarily dictate the grant of the other. *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007). Here, both parties moved for summary judgment with respect to the Company's counterclaim seeking a declaration that the LMC lacked jurisdiction over the Union's grievance (Count II), its counterclaim for a declaration that the LMC's award was in manifest disregard for the law (Count III), its counterclaim for a declaration that the Company is in compliance with its obligations (Count V),[8] and the Union's request for confirmation of the arbitration

_____

[8] The fourth count in the Company's counterclaim was mislabeled as "Count V." The Court retains the numbering used in the counterclaim for continuity of reference.

No. 21-cv-103

award. Although the Court considers the parties' motions separately, it addresses them together, as the factual and legal arguments pertaining to the parties' respective motions overlap substantially, if not entirely.

### A

The Court begins with the parties' respective motions for summary judgment on Count II of the Company's counterclaim, which seeks a judicial declaration that the Union's grievance "did not exist" and "was not arbitrable" under the terms of the CBA. According to the Company, the CBA required all grievances to be "brought to the attention of responsible opposite parties . . . within 15 working days of [the] occurrence," and that any grievance not brought within that period would "be deemed to no longer exist." Dkt. 83-3 at 6. The Company maintains that the "occurrence" at issue in this case was its decision to cease contributing to the pension plan, which took place on or before December 1, 2020. It argues that, because the grievance was not filed within fifteen days of that "occurrence," there was no grievance for the LMC to arbitrate and the LMC exceeded its authority by resolving the dispute and entering the arbitration award. Dkt. 83 at 21-25.

The Union argues that timeliness is a procedural issue that the LMC was entitled to consider and dispose of on the merits. Dkt. 99 at 18-19. It notes that the LMC heard the Company's arguments regarding timeliness (a point the Company concedes)[9] and presumably rejected the Company's position when it entered an award in the Union's favor. *Id.* at 19-22. Although the Union acknowledges that the LMC's decision was "brief," it contends that the LMC properly resolved the Company's timeliness challenge and the Court should not disturb that decision.

The Court agrees with the Union. As this Court has already recognized, the Union and the Company agreed to submit disputes concerning the

---

[9] *See* Dkt. 83 at 17 (stating that the Company's representative presented arguments to the LMC, including a challenge to "the LMC's authority to arbitrate the Grievance based on [the Company's] position that . . . the Grievance 'no longer existed'" under the CBA).

CBA to arbitration, including disputes about their obligations under Addendum Four. Dkt. 62. "[O]nce a court determines that the parties to a collective bargaining agreement are obligated to submit the subject matter of their dispute to arbitration, then any procedural questions growing out of the dispute and bearing on its final disposition should be left to the arbitrator." *Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, Sch., Sightseeing, Charter Bus Drivers, Gen. Promotional Emps. of Affiliated Indus., Loc. Union No. 744 v. Metro. Distributors, Inc.*, 763 F.2d 300, 302 (7th Cir. 1985); *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85, 86 (2002); *see also LodgeWorks, L.P. v. C.F. Jordan Const., LLC*, 506 F. App'x 747, 750 (10th Cir. 2012) (recognizing that disputes about prerequisites to arbitration are presumptively for the arbitrator, not for the judge).

As several courts have recognized, the question of whether a grievance was timely filed is a procedural one subject to arbitration. For example, in *Metro Distributors*, the Court of Appeals for the Seventh Circuit concluded that the "union's alleged failure to submit its members' grievances within the time limitations specified in the collective bargaining agreement [was] an issue of procedural arbitrability which should be reserved for the arbitrator." 763 F.3d at 303. Similarly, in a case involving timely compliance with grievance procedures, the Fifth Circuit held that "[q]uestions of timeliness are ones of procedural, not substantive, arbitrability" and recognized that Supreme Court precedent requires those questions to "be decided by an arbitrator if the underlying substantive claim is arbitrable." *Oil, Chem. & Atomic Workers' Int'l Union, Loc. 4-447 v. Chevron Chem. Co.*, 815 F.2d 338, 341 (5th Cir. 1987) (discussing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964)); *see also Newspaper Guild of Greater Philadelphia Loc. 10 v. Cent. States Pub. Co.*, 451 F. Supp. 1112, 1116 (E.D. Pa. 1978) (deeming timeliness of grievance to be a procedural question). The Court concludes, in accordance with these decisions, that the procedural question of timeliness is arbitrable.

No. 21-cv-103

The Company argues that, notwithstanding the procedural nature of timeliness issue, the Court may nevertheless decide the question of timeliness under the circumstances in this case. The Court disagrees. Although Supreme Court precedent leaves open the possibility that, in some cases, it may be appropriate for a court to resolve procedural issues, that window is narrow. It is open only in those rare instances where it may "confidently be said" that a procedural claim "should operate to bar arbitration altogether." *John Wiley*, 376 U.S. at 557-58. The exception to the rule arises only in those cases where "'no rational mind' could question that the parties intended for [the] procedural provision to preclude arbitration and the breach of the procedural requirement [is] clear." *Chevron Chem. Co.*, 815 F.2d at 342 (quoting *Rochester Telephone Corp. v. Com. Workers of America*, 340 F.2d 237, 239 (2d Cir. 1965)).

This Court cannot say that this is one of the "rare" cases where the exception to the presumption of arbitrability applies. Section 1.10 indicates that any dispute not brought to the attention of the opposite party within fifteen days "of its occurrence shall be deemed to no longer exist." Dkt. 83-3 at 6. The plain language of that Section suggests that someone—presumably an arbitrator—would be required to "deem" a dispute live or dead based on when it was brought in relation to the "occurrence." A rational mind could conclude that this language invites, rather than precludes, an arbitrator to weigh in on whether a grievance was raised within the prescribed timeframe. The Court certainly cannot say that that "no rational mind" would be able to reach such a conclusion. Indeed, the cases this Court has reviewed suggest that parties must use much stronger language if they wish to disclaim an intention to arbitrate. *Compare Chevron Chem. Co.*, 815 F.2d at 342-43 (concluding that, although the agreement provided that only grievances processed "within the time limits herein provided shall be subject to arbitration," the agreement did not specify the forum that would decide the question of timeliness and, consequently, that issue should be decided by an arbitrator), *with Graphic Commc'ns Conf. v. Bucks Cnty. Courier Times*, No. CIV.A. 06-5452, 2008 WL 3889591, at *7-*8 (E.D. Pa. Aug. 18, 2008) (holding that the

8

No. 21-cv-103

question of timeliness was outside the scope of the arbitrator's jurisdiction because the parties agreed that time limits were "of the essence of [the] Agreement" and specified that there was "no agreement to arbitrate any grievance not processed within the time limit" provided). The Court concludes that, under the terms of the CBA, the timeliness of the Company's grievance was subject to arbitration.

Because the LMC had authority to address the issue of timeliness—an issue that, the parties agree, was presented and argued at the arbitration hearing—the Court's review of the LMC's decision is limited. *Int'l Bhd. of Elec. Workers, Loc. Union No. 611, AFL-CIO v. Pub. Serv. Co. of New Mexico*, 980 F.2d 616, 618 (10th Cir. 1992) (describing the standard of review as "among the narrowest known to the law" (citation and internal quotation marks omitted)). So long as the LMC "arguably" construed or applied the contract and acted within the scope of its authority, its decision will not be overturned even if the Court is convinced that a serious error occurred. *Id.* A court may "not interfere with an arbitrator's decision 'unless it can be said with positive assurance that the contract is not susceptible to the arbitrator's interpretation.'" *United Food & Com. Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 947 (10th Cir. 1989) (quoting *Sterling Colo. Beef Co. v. United Food & Commercial Workers Local Union No. 7*, 767 F.2d 718, 720 (10th Cir. 1985)).

The Court acknowledges that the LMC's decision does not provide much to go on; but the fact that the decision is brief and lacking in substance does not preclude judicial review.[10] *See Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.6 (10th Cir. 2001) (noting that the arbitration panel did not provide a basis for its decision and was not required to do so). Where an arbitrator fails to set forth the rationale for its decision, a reviewing Court "must confirm the [LMC's] decision if a ground for the . . . decision can be inferred from the

---

[10] *See* Dkt. 83-24.

9

No. 21-cv-103

facts of the case." *Id.* (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12–13 (2d Cir. 1997)) (second alteration in original).

Reasonable grounds for the LMC's decision can be inferred from the undisputed facts presented here. Although the Company argues that the "occurrence" took place on either November 24, 2020 (when it stated its intention to redirect its contributions) or December 1, 2020 (the effective date of that decision), these are only two possible interpretations of what "occurrence" was challenged by the Union. An equally plausible explanation is that "occurrence" challenged by the union took place on January 15, 2021. Under Addendum Four, the company was required to make its contributions to the pension plan "no later than fifteen (15) days following the end of each calendar month" for which wages were paid. Dkt. 83-4 at 3. The Company made its November contributions in the first half of December 2020. *See* Dkt. 83 at 13 (statement of fact no. 26). The Company's contributions for the month of December were not due until January 15, 2021. Dkt. 83-4 at 3. If the LMC concluded (as it reasonably could have) that the "occurrence" was the Company's failure to make its December contribution on January 15, 2021, then the Union's grievance was timely filed.[11]

Alternatively, the LMC could have determined—as the Union argued—that the grievance was timely filed under a continuing-violation theory. The continuing-violation theory is well-established, and arbitrators can and do apply it to circumstances similar to the one presented in this case. *See, e.g., D.E.I., Inc. v. Ohio & Vicinity Reg'l Council of Carpenters*, 155 F. App'x 164, 171, 172 (6th Cir. 2005) (recognizing that, although not stated expressly

---

[11] Assuming the occurrence was January 15, 2021, the fifteen-working-day window for providing notice (excluding weekends) would have extended until February 5, 2021, the day the Union issued its notice. Dkt. 83-21; *see* Dkt. 83-3 at 16-17 (indicating that the "work week" extends from Monday through Friday for purposes of the CBA unless a shorter period is agreed upon, that work performed on weekends would be paid at the overtime/holiday rate, and identifying agreed-upon holidays).

No. 21-cv-103

by the arbitrator, the grievance could have covered the entire period during which the alleged violations took place, and the continuing-violation theory was "a plausible explanation for why the panel did not find the grievance to be untimely"). The parties' CBA does not indicate how the parties intended ongoing offenses to be addressed, nor does it "contain any language construing whether violations" of the contribution requirements would "recur each time the Company fail[ed]" to make prescribed contributions. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1272 (11th Cir. 2015). The LMC plausibly could have deemed the Company's ongoing failure to make contributions to be a continuing violation. *See id.* (holding that, absent "plainly dispositive language," the arbitrator could have determined that the company's failure to make deductions was "a continuing violation recurring on each weekly paycheck").

Although the Company argues that the continuing-violation theory cannot apply in the context of a contractual repudiation,[12] this argument challenges the legal merits of the arbitrator's decision and is not a basis for disturbing that decision. "It may well be true that the arbitrator committed serious error in applying the continuing violation concept here. It may also be true that the arbitrator ought not to have deemed [the Company's redirection of payments] to be continuing violations." *D.E.I., Inc.*, 155 F. App'x at 171 (quoting *Agipcoal USA, Inc. v. Int'l Union*, No. 88–6122, 1989 WL 66484, at *2 (6th Cir. 1989)) (internal citation and quotation marks omitted). This Court, however, does not "sit to hear claims of factual or legal error by an arbitrator." *Id.* (quoting *Agipcoal*, 1989 WL 66484, at *2) (internal citation and quotation marks omitted). The arbitrator could have arguably construed and applied the CBA when concluding that the Union's grievance covered the Company's ongoing conduct.

---

[12] Dkt. 106 at 5.

11

No. 21-cv-103

In sum, the Court concludes that the question of the grievance's timeliness was properly presented to the arbitrator. The undisputed facts demonstrate that the parties presented arguments on that issue to the LMC. Reasons for the LMC's apparent conclusion that the grievance was timely—including a January 15 occurrence date and the continuing-violation theory—can be inferred from those undisputed facts and the provisions of the CBA and Addendum Four. The CBA and Addendum Four are susceptible to the arbitrator's interpretation. As a result, the Court holds, as it must, that the LMC acted within the scope of its jurisdiction when it issued the arbitration award. This holding necessitates the denial of the Company's motion for summary judgment on Count II of its counterclaim. The holding also requires that the Union's motion for summary judgment be granted on that Count.

## B

The Court next turns to the parties' motions for summary judgment on Count III of the Company's counterclaim, which seeks a judicial declaration that the LMC's award was made in manifest disregard of the law and fails to draw its essence from the language of the CBA. Dkt. 17 at 19-20; Dkt. 83 at 26-29. The Company argues that, under the express terms of the CBA as modified by Addendum Four, it had the unambiguous right to "terminate its obligation to contribute" to the pension plan (and instead make contributions to a profit-sharing plan) once the pension plan reached "full funding (as certified by the Pension Fund's actuary)." Dkt. 83-4. It submits that the pension plan's actuaries "certified that the Pension Plan's assets as of December 31, 2019, were $30,952,946.00," an amount that exceeded the then-present value of the vested benefits. Dkt. 83 at 27. The Company contends that, because the then-present value of the pension plan's assets exceeded its vested liabilities, "the actuary found that the Pension Plan had met its minimum funding requirement" and the Company was "well within its rights" when it opted to cease contributions to the pension plan. *Id.* at 27-28. It maintains that, by concluding otherwise, the LMC "ignored and disregarded" the express language of the parties' agreement.

12

No. 21-cv-103

The Union responds that the LMC permissibly rejected the contention that the pension plan was fully funded. Dkt. 99 at 25-27.[13] The Union notes that the actuarial valuation relied upon by the Company does not contain language certifying that the pension plan was fully funded, and therefore fails to establish the conditions that would permit an employer to redirect its contributions away from the pension plan under the express terms of Addendum Four. *Id.* It further argues that the LMC received and reviewed a memorandum confirming that the pension fund's actuary had not, and could not, certify that the plan was fully funded for the purposes of Addendum Four. *Id.* at 27. The Union argues that the LMC was presented with evidence sufficient to support its decision and that, as a result, the Company is not entitled to the relief it requests.

The Court agrees with the Union. As discussed in Section II-A, *supra*, the Court is not permitted to interfere with an arbitration award simply because it disagrees with the decision, could have reached a contrary conclusion, or finds error. *Int'l Bhd. of Elec. Workers, Loc. Union No. 611, AFL-CIO v. Pub. Serv. Co. of New Mexico*, 980 F.2d 616, 618 (10th Cir. 1992). Unless the Court can say "with positive assurance that the contract is not susceptible to the arbitrator's interpretation," the arbitrator's decision must be affirmed. *See United Food & Com. Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 947 (10th Cir. 1989) (quoting *Sterling Colo. Beef Co. v. United Food & Commercial Workers Local Union No. 7*, 767 F.2d 718, 720 (10th Cir. 1985)).

The Company is not entitled to relief under the highly deferential standard applicable here. As noted in the Union's statement of undisputed facts, the LMC heard evidence and argument that the pension plan had not been, and could not be, certified as fully funded. Dkt. 99 at 14-15 (additional

---

[13] The Union notes that some of the evidence submitted by the Company was not presented to the LMC. *See* Dkt. 99 at 26 (asserting that only Greg Logan presented testimony to the LMC, and Mark Stewart and Gene Brent did not). That evidence, which the Court need not consider, has no effect on the Court's analysis given the standard of review applicable in this case.

No. 21-cv-103

statements of fact nos. 61, 62). The Company concedes that the LMC heard that evidence. *See* Dkt. 103 at 2 (disagreeing only as to whether the evidence and arguments provided a basis for disregarding contractual terms or established a violation of those terms). The Company's concession is dispositive. Even if the LMC heard and received all the evidence that allegedly supports the Company's position, it remains undisputed that the LMC also reviewed evidence that could support a contrary conclusion, including a memorandum from the pension plan's actuary advising that (1) it had been asked to certify the plan as fully funded on December 4, 2020, and could not do so, (2) setting forth the conditions that would allow the plan to be "fully funded" for purposes of Addendum Four, and (3) advising that "the Plan [was] far from fully funded for purposes of Addendum Four" as of January 1, 2020. Dkt. 99-2. The undisputed facts show that, at a minimum, the LMC was in possession of evidence that could have supported its conclusion that the pension plan was not fully funded and the Company violated its obligations under Addendum Four when it ceased contributing to that plan.

The Court can readily infer how the LMC could have reached its decision based on the facts before it. Because grounds for the LMC's decision "can be inferred from the facts of the case," the Court must confirm that decision. *Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.6 (10th Cir. 2001) (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12–13 (2d Cir. 1997)). In arguing otherwise, the Company asks this Court to re-weigh the evidence that the LMC heard and reach a different conclusion. *See* Dkt. 83 at 27 (arguing that the pension plan was fully funded based on considerations other than those set forth in the actuary's memorandum). The Court may not do so. A court cannot re-weigh evidence or substitute its opinion for the arbitrator's when reviewing an arbitration award. *See Jenkins v. Prudential-Bache Sec., Inc.*, 847 F.2d 631, 635 (10th Cir. 1988) ("To resolve disputes . . . an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them." (quoting *United Paperworkers Int'l Union v. Misco*, Inc., 484 U.S. 29, 38 (1987))).

14

No. 21-cv-103

The Court concludes that, under the plain language of Addendum Four, the Company was not permitted to terminate its obligation to contribute to the pension fund until the pension fund "reache[d] full funding (as certified by the Pension Fund's actuary)." Dkt. 83-4 at 2. The Court further finds, based on the undisputed facts, that the LMC received evidence that the actuary had not, and could not, make that certification. It was therefore permissible for the LMC to conclude that the Company breached Addendum Four when it ceased making contributions to the pension plan, and the Court cannot say with any assurance that the LMC's decision was issued without authority, was contrary to the parties' agreement, did not draw its essence from the parties' agreement, or was unfounded in reason or fact. Accordingly, there is no factual or legal basis to support the Company's request to vacate that decision as requested in Count III of the Company's counterclaim, and the Company's motion for summary judgment on that Count is denied. For the same reasons, the Union's motion for summary judgment on Count III of the Company's counterclaim is granted.

C

Next, the Court turns to Count V of the Company's counterclaim, which seeks a declaratory judgment that the Company acted in accordance with Addendum Four and that it has no further obligation to contribute to the pension plan. Dkt. 83 at 29. The Company presented no new arguments in support of its motion for summary judgment on this counterclaim, which may only be granted if the LMC lacked authority to issue its decision. *See* Dkt. 83 at 30 (arguing only that the Court "is empowered to issue a ruling declaring the rights of the parties and specifically [the Company's] right to withdraw from the Pension Plan"). For the reasons set forth in Sections II-A and B, *supra*, the Court holds that the LMC had authority to issue its ruling and acted within the scope of its authority when it did so. The Company cannot obtain the relief it requests, and its motion for summary judgment on Count V must be denied; for the same reasons, the Union's motion for summary judgment on Count V is granted.

No. 21-cv-103

## D

Finally, the Court turns to the Union's motion for summary judgment on its request for confirmation and enforcement of the LMC's arbitration award. As the Tenth Circuit recently recognized in a related proceeding, "a court may vacate an arbitration award where 'the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'" *Brent Elec. Co., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 584*, 110 F. 4th 1196, 1229 (10th Cir. 2024) (quoting 9 U.S.C. § 10(a)(4)). In response to the Union's motion, the Company argues only that it never agreed to arbitrate untimely grievances and that the LMC exceeded its authority by issuing an award that could not be supported by any interpretation of Addendum Four. The Court has already considered and rejected these arguments. *See* Sections II-A and B, *supra*. Because the Company presents no other evidence or arguments to support the conclusion that the LMC exceeded its powers or executed them so imperfectly that "a mutual, final, and definite award upon the subject matter submitted was not made," the arbitration award must be confirmed. *Brent Elec. Co.*, 110 F. 4th at 1229 (affirming grant of summary judgment after rejecting the company's contention that the arbitrator had exceeded its powers). The Company's motion for summary judgment on the Union's claim is denied; the Union's competing motion is granted.

## III

The Union asks to recover its attorneys' fees because of the Company's "pattern of noncompliance and serial meritless challenges" to arbitration awards. Dkt. 99 at 31. A district court has discretion to award fees in an action to enforce an arbitration award if it can be said that the unsuccessful party acted in bad faith, vexatiously, wantonly, or in an oppressive manner. *See Fabricut, Inc. v. Tulsa Gen. Drivers, Warehousemen & Helpers, Loc. 523*, 597 F.2d 227, 230 (10th Cir. 1979). The Court declines to award fees in this case. The Court notes that, at a scheduling conference, the Company recognized the difficult path before it based on the rulings that had been entered in this

No. 21-cv-103

and other cases, but the Company expressed concern that it would be subject to inconsistent and competing obligations if it were to cease making payments to the JATC fund and profit-sharing plan without a final order requiring it to do so. It was not unreasonable or vexatious for the Company to seek a final judicial order on a disputed issue to protect itself from inconsistent and competing obligations. The Union's motion for attorneys' fees is denied.

## IV

The Court denies the Company's motion for summary judgment on the Union's claim and the Company's Counterclaims. The Union's motion for summary judgment on those issues is granted. The Court confirms the LMC's February 11, 2021 arbitration award and directs the Company to comply with its terms.

DATED this 30th day of July 2026.

JOHN D. RUSSELL
*United States District Judge*